# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

SS WHITE BURS, INC.

       Plaintiff,                                          NO. 1:18-cv-00698-WJ-KBM

     v.

GUIDANCE ENDODONTICS, LLC,

       Defendant.

## MEMORANDUM OPINION AND ORDER
## DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
## and
## GRANTING DEFENDANT'S CROSS-MOTION TO COMPEL ARBITRATION AND DISMISS CASE

THIS MATTER comes before the Court upon:

- Plaintiff's Motion for Preliminary Injunction, filed August 10, 2018 **(Doc. 16)**; and

- Defendant's Cross-Motion to Compel Arbitration and Dismiss **(Doc. 19).**

Having reviewed the parties' pleadings and the applicable law, the Court denies Plaintiff's motion for injunctive relief and grants Defendant's cross-motion to compel arbitration and to dismiss case.

## BACKGROUND

SS White Burs, Inc. ("SS White") brings this action seeking injunctive and other relief as a result of the anticipatory breach of an agreement dated April 27, 2018 between defendant Guidance Endodontics, LLC ("Guidance") and SS White ("2018 Handwritten Agreement").[1] SS

---

[1] Plaintiff refers to the document as the "Settlement Agreement," but because it is a matter of dispute as to what was "settled" between the parties based on this agreement, the Court will use the more generic description of the document.

White seeks to enforce its written contract with Guidance under the 2018 Handwritten Agreement and to obtain a preliminary and permanent injunction requiring Guidance to immediately perform under that agreement by transferring all rights and interests in "V-Taper Patents" to SS White. Shortly after Plaintiff filed this federal action, Defendant filed a demand for arbitration with the American Arbitration Association ("AAA"), alleging that SS White breached the parties' prior agreements.

In short, Plaintiff filed this lawsuit to put an end to the arbitration proceedings initiated by Defendant, while Defendant seeks to compel arbitration and dismiss this case.[2]

This Court has jurisdiction under 28 U.S.C. §1332(a). The First Amended Complaint ("Complaint" hereinafter) states that Plaintiff is an Illinois corporation with its principal place of business in New Jersey and is co-owned and operated by Tom Gallop. Defendant is a New Mexico limited liability company with its principal place of business located in Albuquerque. Charles Goodis is a citizen of New Mexico and the sole member of Guidance. The Complaint also states that Dr. Goodis conducts his business though Guidance and Edge Endo, LLC ("Edge Endo") and uses these entities interchangeably; and that Guidance is an alter-ego of Edge Endo and vice versa. Compl., ¶¶2-6.

**I.    Facts**[3]

    A.    <u>License Agreement and January 2016 Amendment</u>

---

[2] Defendant's response to Plaintiff's motion is both a response and a cross-motion to compel arbitration (Doc. 16); Document 29 is Plaintiff's reply to its own motion as well as a response to Defendant's motion to compel arbitration; and Document 29 is Defendant's reply to its cross-motion to compel arbitration, which seeks dismissal of the case.

[3] The Court omits references to supportive exhibits for these facts, which are included in the pleadings, except where necessary. These facts are an amalgam of the parties' undisputed facts.

SS White is a manufacturer of medical devices used by dental professionals for cavity preparations, root canals and the addition of crowns and bridges. Dr. Goodis is an endodontist and inventor who was awarded a patent on an innovative design of a variable tapered endodontic file ("V-Taper Patents") that is used in root canal procedures.

On March 26, 2015, SS White and Guidance entered into a License Agreement ("License Agreement") under which Guidance gave SS White a license to manufacture and sell endodontic files covered by intellectual property owned by Guidance in exchange for making certain royalty payments to Guidance. The agreement contained an arbitration clause stating:

> Any disputes by and between the parties arising under this Agreement, other than claims for injunctive relief described in Section 15.1, shall be resolved by arbitration.[4]

Doc. 5-1, §15.2. The agreement also contained a provision regarding modifications:

> This Agreement may be modified only by a written instrument that specifically refers to this Agreement and is signed by an authorized official of each Party.

Doc. 5-1, §20.6.

On January 31, 2016, the parties amended the License Agreement ("2016 Amendment") to change the amounts of the yearly minimum royalty payments required to keep the license exclusive, but otherwise left all terms of the License Agreement in effect, including the mandatory arbitration provision:

> [a]ll other terms and conditions of the [Licensing Agreement] remain unchanged" [and that the] Amendment incorporates all the rights and obligations contained in the [Licensing Agreement], including the provisions with respect to confidentiality.

Doc. 5-2 at 2.

    B.    <u>2018 Handwritten Agreement</u>

---

[4] The "claims for injunctive relief" that are excepted from arbitration in this agreement are claims regarding: product liability insurance, quality control, confidential information and Guidance's ownership of intellectual property. *See* Doc. 5-1, §§ 11, 12, 14 & 18.

3

Following the 2016 Amendment, Plaintiff claims that disputes arose regarding the royalty payments allegedly owed by SS White to Guidance. According to Defendant, without any explanation or justification, Plaintiff simply abruptly stopped paying the required royalties after March 2017.

The parties subsequently had discussions regarding this failure to pay accrued royalties. Plaintiff mentions one such attempt at a resolution, with Guidance making an offer of compromise to SS White, agreeing to waive the allegedly overdue royalty payments in return for providing Edge Endo (another company Dr. Goodis founded, owned, and operated) with certain SS White products worth approximately $350,000.00 per year over the course of five years. This negotiation attempt proved unsuccessful.

Another discussion that is very pertinent to this lawsuit took place in April 2018, at a conference of the American Association of Endodontists. Dr. Goodis offered, on behalf of Guardian, to sell ownership of certain V-Taper patents outright to SS White in return for: (1) SS White paying the accrued royalties for 2016 and 2017; and (2) yearly payments of $175,000.00 from 2018 through 2022. Mr. Gallop accepted the offer and counteroffer on SS White's behalf. Defendant describes the conversation about this agreement as brief and rushed but the parties were able to memorialize this agreement on a single-page, hand-written document which the Court transcribes here only for demonstrative and practical purposes:

> SS White pays Accrued royalties per Agreement
>         +
> $175k/yr   Next 5 years
> 2018, 2019, 2020, 2021 & 2022
>
> In exchange for this
> **Edge Endo** grants SSW Ownership
> Of all V Taper Patents
>
> (signatures):

>    Chuck Goodis, CEO
>    Tom Gallop, SSW CEO

*See* Doc. 5-3 (emphasis added). Plaintiff notes that reference to "Edge Endo" instead of Guidance was a mutual "drafting error" in that the parties intended to bind Guidance, not Edge Endo, in requiring transfer of the V-Taper patents to SS White since Guidance (not Edge Endo) is the owner of those patents.

      C.      <u>Facts Subsequent to Execution of 2018 Handwritten Agreement</u>

On May 11, 2018, SS White contacted Dr. Goodis to correct the drafting error (reference to "Edge Endo" instead of Guidance) and to effectuate the transfer of ownership of the V-Taper patents from Guidance to SS White. Plaintiff claims that Guidance responded by letters (dated May 29, 2018 and June 20, 2018) and by phone (on June 6, 2018) that it would not deliver the V-Taper patents to SS White because the 2018 Handwritten Agreement was invalid.

Defendant adds (and Plaintiff does not dispute) that on May 11, 2018, Plaintiff e-mailed Defendant a detailed and multipage Microsoft Word document titled "Second Amendment to License Agreement" ("May 2018 Proposal") along with the message, "How does this work?" Doc. 19-7. The May 2018 Proposal, which was drafted by SS White, stated that it would become effective as of the "Effective Date" to be set sometime in the future, upon execution, without any date entered on the document. Goodis Decl. ¶ 16; Doc. 19-7 at 1. The May 2018 Proposal also provided that numerous provisions of the License Agreement including the arbitration provision, would "remain in full force and effect." Doc. 19-7 at 3, ¶3.

Dr. Goodis contends that he did not accept the May 2018 Proposal on behalf of Guidance because it did not contain provisions that were important to Guidance, including a provision specifying that Dr. Goodis' endodontic companies would be provided with a royalty-free license to the technology Dr. Goodis himself invented. Doc. 19-1 (Goodis Decl.) ¶ 17. Dr. Goodis states

that he "never would have agreed to assign any patent unless I and all of my companies had the ability to use the patented technology [he] developed without paying royalties").

In a May 24, 2018 e-mail, Mr. Gallop urged Dr. Goodis to "memorialize" the agreement because "[a]mbiguity can lead to disputes." Doc. 19-8 at 1. The parties never executed the May 2018 Proposal.

## DISCUSSION

SS White maintains that it should not be forced to arbitrate with Defendant because the 2018 Handwritten Agreement, which settled the parties' previous disputes and supersedes prior agreements, does not contain an arbitration provision. Defendant argues that Plaintiff is trying to avoid paying royalties that it was contractually obligated to pay by claiming that the 2018 Handwritten Document is actually a binding and fully-integrated contract when it was intended only to be a starting point for future negotiations.

This dispute ultimately centers on the validity of the 2018 Handwritten Document. If it controls, Plaintiff cannot be forced to arbitrate because that agreement does not contain an arbitration provision. Plaintiff would then likely prevail on the merits and be successful in obtaining the injunctive relief it requests.[5] However, if the License Agreement controls, Defendant's motion to compel arbitration would be granted because that agreement incorporated all the terms of the Licensing Agreement, including the arbitration provision. The Court sees no point in delaying the inevitable; the analysis will start out by determining whether the 2018 Handwritten Agreement is valid and enforceable. The answer to this question will be dispositive.

**I.     Choice of Law**

---

[5] To obtain a preliminary injunction, a plaintiff must show (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1224 (10th Cir. 2008)(citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

Defendant contends that New York law should be applied to the interpretation and enforcement of the License Agreement, including the mandatory arbitration clause in §15.2 of that agreement. If so, then the question of whether the 2018 Handwritten Agreement is a valid and enforceable modification to the License Agreement and whether it "superseded" the License Agreement would also be governed by New York law. Alternatively, Defendant suggests that if the Court determines that the 2018 Handwritten Document is not governed by New York law, the Court should apply Colorado law under the doctrine of *lex loci contractus,* since the parties do not dispute that the 2018 handwritten Document was prepared and signed in Colorado.

Plaintiff argues that application of New York law is improper essentially because it has not yet been decided whether the choice of law provision in the License Agreement was a valid contractual term. *See B-S Steel Of Kansas, Inc. v. Texas Indus., Inc.*, 439 F.3d 653, 661 (10th Cir. 2006) (noting the "logical flaw inherent in applying a contractual choice of law provision before determining whether the underlying contract is valid"); *Schnabel v. Trilegiant Corp*., 697 F.3d 110, 119 (2d Cir. 2012) (rejecting application of choice-of-law provision where its application "to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established"). However, Plaintiff's argument is misplaced, since Plaintiff has never argued—and does not argue here—that the License Agreement or any of its terms is valid. Rather, Plaintiff's entire argument turns on whether a *later* agreement (the 2018 Handwritten Agreement) supersedes that License Agreement. Thus, the undisputed validity of the License Agreement dictates that New York law should be applied to interpret and enforce all aspects of the parties' agreement and there is no need to look further into alternatively applying Colorado law.

II. **Validity and Enforceability of 2018 Handwritten Agreement**

Plaintiff argues that the 2018 Handwritten Agreement is valid and enforceable because each of the parties signed the document, and because it contains all of the material and essential terms needed for its enforcement. However, Plaintiff cannot succeed on these arguments based on documents submitted by the parties,

Plaintiff does not dispute the accuracy of the pertinent documents presented as exhibits in these pleadings: the License Agreement (Doc. 5-1); the 2016 Amendment (Doc. 5-2) and the 2018 Handwritten Agreement (Doc. 5-3). Defendant also includes as exhibits, the May 2018 Proposal (Doc. 19-7 at 2-4) and a document entitled "Assignment" which describes in detail the patents that are sought by Plaintiff and are at issue here (Doc. 19-7 at 6-7). Plaintiff does not dispute either the existence or authenticity of these documents exist, but rather characterizes them collectively as a "distraction" because it is extrinsic evidence that should not be considered.

Plaintiff is correct that extrinsic evidence cannot generally be used in contract interpretation. *See, e.g., Vuono v. Interpharm Holdings, Inc.*, 55 A.D.3d 825, 865 N.Y.S.2d 676 (2008) (extrinsic evidence is not permitted to determine the parties' intent as to the meaning of language in contract); *Posh Pillows, Ltd. v. Hawes*, 138 A.D.2d 472, 473, 525 N.Y.S.2d 877, 878 (1988) (extrinsic evidence cannot be used to shed light of meaning of words in contract). However, the Court would not be using the extrinsic evidence presented here to interpret or modify the terms of any agreement. *See Am. Mining Co. v. Himrod-Kimball Mines Co.*, 235 P.2d 804, 806 (Colo. 1951) (holding that, in absence of ambiguity in a contract, "strained construction must not be employed, nor extrinsic evidence permitted in modification thereof"). Instead, it would be considered to help determine whether a contract existed in the first place. This evidence will be useful to help determine whether the 2018 Handwritten Agreement was intended as a contract between the parties, and as such is a permissible use of extrinsic evidence. *See Schutty v. Speiser*

*Krause P.C.*, 86 A.D.3d 484, 485, 928 N.Y.S.2d 4 (N.Y. App. Div. 2011) (finding no contract where the unsuccessful negotiations showed that "the parties did not *intend* to be bound until there was a signed written contract") (emphasis added).[6]

To avoid arbitration and prevail on the merits for injunctive relief, Plaintiff must show that the 2018 Handwritten Agreement is a valid and enforceable contract and that it was intended to supersede the parties' previous agreements. The Court finds that it is neither for the following reasons:

- On its own, the 2018 Handwritten Agreement is incomplete and leaves certain material terms open for future negotiations. While the document contains both parties' signatures, there is no date at all affixed to the document or referred anywhere on its face. Also, the document does not specify the effective date of the "agreement," the date of payments from SS White, or the amounts due, even though there are blanks left for this information which the parties obviously intended to be filled in at a later date. Under New York law, "if an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." *Total Telcom Grp. Corp. v. Kendal on Hudson*, 157 A.D.3d 746, 747, 68 N.Y.S.3d 491 (N.Y. App. Div. 2018) "A mere agreement to agree, in which a material term is left for future negotiations, is unenforceable." *Id.* at 747.

- The 2018 Handwritten Agreement contains no specific reference or description to any the patent assignments, merely referencing "V-Taper Patents." Doc. 5-3 at 2. This is insufficient to show a meeting of the minds as to the sale of these patents. *See Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1321–24 (Fed. Cir. 2017) (assignment of patent invalid where agreement "did not expressly identify" the patent); *Euclid Chem. Co. v. Vector Corrosion Techs., Inc.*, 561 F.3d 1340, 1344 (Fed. Cir. 2009) (holding that an assignment that did not "recite the patent number" to be invalid).[7] In contract, the *subsequent* May 2018 Proposal, sent by Mr. Gallop for Dr. Goodis' review in May 2018, included the "Assignment" attachment which does describe in detail the patents at issue here. This is additional evidence that the agreement was a "work in progress" between the parties and not a legally enforceable contract.

- The May 2018 Proposal includes provisions referring to the payment of accrued royalties and annual payment of $175,000 for the years 2018 to 2022, *both* of which were terms of the 2018 Handwritten Agreement. *See* Doc. 19-7 at 2 (¶1(b) (referring to payment of

---

[6] *See also I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 888 (Colo. 1986) (en banc) ("evidence of the parties' conduct, their oral statements and their writings, and other evidence illuminating the circumstances surrounding the making of an agreement are admissible to clarify the intent and purpose of the parties") (emphasis added).

[7] As Defendant notes, Plaintiff concedes that consideration of extrinsic evidence is permissible, for example, in resolving any ambiguities concerning what the parties understood as the "V-Taper Patents." *See* Doc. 28 at 17.

9

accrued royalties); and Doc. 19-7 at 3 (¶2(c) (referring to annual payment of $175,000 for years 2018 to 2022). The fact that these same terms were repeated in the May 2018 Proposal is another strong indication that the 2018 Handwritten Agreement was meant as part of negotiations between the parties and that the generic terms in that agreement were meant to be incorporated later into another document.

- Plaintiff claims that the reference to "Edge Endo" instead of "Guidance" was merely a "drafting error" and "mutual mistake" which is of no consequence. Plaintiff minimizes the consequences of this error. Edge Endo was not a party to the License Agreement and does not own any of the intellectual property that was purportedly transferred. The so-called "drafting error" calls into doubt the legal validity of the 2018 Handwritten Agreement.

- Subsequent correspondence between the parties also reinforces the finding that the 2018 Handwritten Agreement was intended only to be a starting point for future negotiations. These e-mails reveal a "tug-of-war" between the parties: Plaintiff insisting that Defendant "memorialize" the agreement, and Defendant demanding past due royalties before moving forward with the deal. Docs. 19-8, 19-9, 19-10. Based on this correspondence, it is clear that the parties did not intend to be bound by any of the terms in the 2018 Handwritten Agreement until subsequent proposed agreements were negotiated and executed. *See Jordan Panel Sys., Corp. v. Turner Const. Co.*, 45 A.D.3d 165, 169, 841 N.Y.S.2d 561 (N.Y. App. Div. 2007) (When a party "gives forthright, reasonable signals that it means to be bound only by a written agreement, courts should not frustrate that intent.").

Plaintiff contends that this Court may and should supply the missing terms in the 2018 Handwritten Agreement, relying on *Stice v. Peterson*, 355 P.2d 948 (Colo. 1962). However, Plaintiff mischaracterizes *Stice* because that court did not supply any missing terms from the parties' contract. *Id.* at 952 ("The court can supply some elements in a contract, but they cannot make one; and when the language in a contract is too uncertain to gather from it what the parties intended, the courts cannot enforce it."). In fact, the court in that case found that because the oral contract omitted the terms, conditions and manner of payment, the contract was "incomplete and ambiguous." *Id.* Plaintiff apparently expects this Court to fill in the blanks and provide all the missing information from the 2018 Handwritten Agreement, such as: dates of performance, amounts to be paid, and descriptions and details about the intellectual property rights to be

transferred. As Defendant observes, doing so would be tantamount to having the Court create an entirely new contract.

Plaintiff also maintains that the 2018 Handwritten Agreement wholly supersedes the parties' prior agreements, even if all the provisions in those agreements were not included, because they cover the same subject matter and so they cannot operate together. This contention is not supported by any relevant case law. As Defendant observes, the cases on which Plaintiff relies involve situations where the subsequent agreement "completely" covers the same subject matter as the prior agreement. In such situations, it is clear that the two contracts cannot stand together, and the later agreement substitutes for the prior one. *See, e.g., Coop. Refinery Ass'n v. Consumers Pub. Power Dist.*, 190 F.2d 852, 856 (8th Cir. 1951) *Pasotex Petroleum Co. v. British-Am. Oil Producing Co.*, 431 P.2d 373, 380 (Okla. 1966). An agreement supersedes another only where the same subject matter is in fact covered in the subsequent agreement. *See A&E Television Networks, LLC v. Pivot Point Entm't, LLC,* No. 10 Civ. 09422 AJN, 2013 WL 1245453, at *10–11 (S.D.N.Y. Mar. 27, 2013) ("subsequent contract not pertaining to precisely the same subject matter will not supersede an earlier contract unless the subsequent contract has definitive language indicating it revokes, cancels or supersedes that specific prior contract"); *Long Side Ventures, LLC v. Adarna Energy Corp.*, No. 12cv6836-LTS-MHD, 2014 WL 4746026, at *6 (S.D.N.Y. Sep. 24, 2014) ("where the parties have clearly expressed or manifested their intention that a subsequent agreement supersede or substitute for an old agreement, the subsequent agreement extinguishes the old one. . . .").

This is not the situation here. The 2018 Handwritten Agreement is conspicuously silent with regard to a mandatory arbitration provision. There is not even an integration clause indicating that it constitutes a complete and exclusive statement of the terms of the parties' agreement or that

it incorporates any of the terms of previous agreements. Even the 2016 Amendment, barely half a page long, made sure to note that "all other terms and conditions" of the License Agreement were incorporated into that document. Doc. 19-3. New York law (and even under the Colorado cases relied on by Plaintiff) requires some indication that a provision is revoked, canceled or superseded. Here there is only silence, which is insufficient to signal that the mandatory arbitration provision has been superseded. New York law also allows a court to "enforce a contract if the parties have completed negotiations of essential elements, even when 'the parties have expressly left . . . other elements for future negotiation and agreement.'" *Aiello v. Burns Int'l Sec. Servs. Corp.*, 110 A.D.3d 234, 243, 973 N.Y.S.2d 88 (2013). However, the 2018 Handwritten Agreement cannot be enforced because documents and correspondence subsequent to the 2018 Handwritten Agreement show that the parties did *not* complete negotiations of essential elements, and more importantly, there is absolutely no indication that the parties intended to revoke or cancel the mandatory arbitration provision.

Based on the evidence submitted in this case, the Court finds that the 2018 Handwritten Agreement was never meant to constitute a complete and exclusive document fully expressing the intent of the parties and so it is not a valid and binding contract. The evidence shows that the parties understood that the key terms and details would need to be negotiated further before any contract was formed. This means that the arbitration provision from the License Agreement is still intact, valid and enforceable. It also means that even if the Court were to consider 2018 Handwritten Agreement to be valid and enforceable at least as to the terms expressly stated therein, the arbitration provision in the License Agreement and incorporated into the 2016 Amendment still obligates the parties to arbitrate all of their disputes under the License Agreement.

### III. Plaintiff's Request for Injunctive Relief

To obtain a preliminary injunction, a plaintiff must show (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Id.* (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). The success of Plaintiff's motion for a preliminary injunction rides on a finding that the 2018 Handwritten Agreement, which does not contain an arbitration provision, supersedes the parties' prior agreements. It would then follow that Plaintiff cannot be forced to participate in the arbitration proceeding initiated by Defendant.

As it turns out, however, the Court has found that the 2018 Handwritten Agreement is not a valid and enforceable contract and even assuming it was a valid and enforceable contract, it certainly does not supersede the parties' prior agreements. Thus, arbitration is mandatory for any disputes by and between the parties arising under the License Agreement. Accordingly, the Court finds that Plaintiff's request for injunctive relief is moot in light of the above findings of the Court.

Additionally, the Court notes that SS White's conduct belies its claim that it is being "forced" to arbitrate with Defendant. Plaintiff not only agreed to an arbitration provision in the License Agreement in 2015 (and to its incorporation in the 2016 Amendment), but also included an arbitration provision in the May 2018 Proposal drafted by SS White nine months ago. The inclusion of an arbitration provision in a document that was created *subsequent* to the 2018 Handwritten Agreement should work to estop Plaintiff from claiming either that the parties intended to revoke the arbitration provision or that Plaintiff would be irreparably harmed by being forced into arbitration.

**IV.    Defendant's Cross-Motion to Compel Arbitration**

Determining the arbitrability of the parties' dispute is a threshold question that should be decided by the court, not the AAA. *See, e.g., AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649, 651 (1986). As a general rule, it is for the "court, not the arbitrator," to decide whether parties have agreed to arbitrate disputes between them. *Id.* at 651. That general rule applies unless the parties "clearly and unmistakably provide otherwise." *Id.* at 649; *see also Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002).

Federal policy favors arbitration, and "all doubts must be resolved in favor of arbitrability." *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir. 2002). While the presence of an arbitration clause generally creates a presumption in favor of arbitration, this presumption "disappears when the parties dispute the existence of a valid arbitration agreement." *Id.* at 1220. *see also Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 779 (10th Cir. 1998) ("[W]hen the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away.")

The Court has reviewed and considered the evidence submitted, including the parties' negotiations and correspondence and has concluded that the mandatory arbitration provision in the License Agreement is valid and enforceable Therefore, arbitration may be compelled in this case. *See Hancock v. AT&T Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012) (Where parties dispute the existence of an agreement to arbitrate, "a court may grant a motion to compel arbitration if there are no genuine issues of material fact regarding the parties' agreement."). A district court may also dismiss a lawsuit when all claims are arbitrable. *Armijo v. Prudential Ins. Co. of Am.*, 72 F.3d 793, 796–97 (10th Cir. 1995).

Having found that the mandatory arbitration provision still governs the parties' agreements, the Court grants Defendant's motion to compel arbitration. Moreover, the Court having found that

Defendant's motion to compel arbitration is proper,  the Court further finds that dismissal of this case is appropriate.

Finally, SS White requests in the alternative that the Court set a date for a summary trial on the issue of arbitrability along with concomitant discovery. Doc. 28 at 20.  The request is denied. The Court finds the material facts are undisputed, and that the Court needed to decide only the legal significance of the facts. *See Benns v. Continental Cas., Co*., 982 F.2d 461, 462 (10th Cir. 1993) (insurance contract).

## CONCLUSION

In sum, this Court finds and concludes that the 2018 Handwritten Agreement is not a valid and enforceable contract but assuming that the 2018 Handwritten Agreement was valid, it does not supersede the parties' earlier agreements that contain a mandatory arbitrary provision.

The Court further finds and concludes that Plaintiff's request for injunctive relief is rendered moot by the Court's findings regarding the existence of a legally enforceable arbitration provision, and so Plaintiff's motion for a preliminary injunction is denied.

The Court also finds and concludes that Plaintiff is obligated, under that arbitration provision, to arbitrate any disputes between the parties arising from the License Agreement and the 2016 Amendment, and grants Defendant's motion to compel arbitration and its request for dismissal of this case.

**THEREFORE,**

**IT IS ORDERED** that Plaintiff's Motion for Preliminary Injunction **(Doc. 16)** is hereby DENIED for reasons described in this Memorandum Opinion and Order;

**IT IS FURTHER ORDERED** that Defendant's Cross-Motion to Compel Arbitration and Dismiss **(Doc. 19)** is GRANTED for reasons described in this Memorandum Opinion and Order;

**IT IS FINALLY ORDERED** that this matter is hereby DISMISSED WITH PREJUDICE.

A Rule 58 Judgment shall issue separately.

_____
CHIEF UNITED STATES DISTRICT JUDGE